IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KRISTINA M. HENDERSON,

    Plaintiff,

                                  6:13-CV-01184-PK

                                  OPINION AND ORDER

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

_____

PAPAK, Magistrate Judge:

    Plaintiff Kristina M. Henderson filed this action July 15, 2013, seeking judicial review of the Commissioner of Social Security's final decision denying her applications for supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act") and for disability insurance benefits under Title II.    This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

Page 1 - OPINION AND ORDER

Henderson argues that by erroneously rejecting medical evidence and erroneously rejecting her testimony regarding the extent of her impairments, the Commissioner failed properly to assess her residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and for that reason erred by finding Henderson capable of performing work as a candy maker helper, laundry helper, and hand packager at step five of the process.

I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's decision is affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See*

*Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b).  Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii).  An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).  Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154.  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will

Page 3 - OPINION AND ORDER

conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

characteristics and RFC could perform any jobs that exist in significant numbers in the national

economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g),

404.1560©, 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner

meets her burden to demonstrate the existence in significant numbers in the national economy of

jobs capable of being performed by a person with the RFC assessed by the ALJ between the third

and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*,

482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566,

416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits

if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see*

*also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253

Page 5 - OPINION AND ORDER

F.3d 1152, 1156 (9th Cir. 2001).  Moreover, the court may not rely upon its own independent

findings of fact in determining whether the ALJ's findings are supported by substantial evidence

of record.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery*

*Corp.*, 332 U.S. 194, 196 (1947).  If the ALJ's interpretation of the evidence is rational, it is

immaterial that the evidence may be "susceptible [of] more than one rational interpretation."

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d

1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Henderson was 32 at the time of the hearing.  Tr. 51.[3]  She attended school through the

ninth grade, and has received no subsequent formal education or vocational training.  *Id.*

According to the evidence of record, prior to her claimed amended disability onset date of May

18, 2009, Henderson had no substantial gainful activity.

The medical record is extensive.  The medical records for the year prior to the alleged

onset date and the year after the alleged onset date are summarized below.

On April 1, 2008, Plaintiff reported to Donald McFerran, P.M.H.N., that she was

diagnosed with ADHD and bipolar disorder at age 12.  She stated she had been off drugs for 12

years and alcohol for two years.  Tr. 783.  Plaintiff reported being raped three times since leaving

high school, and sexually abused as a child.  *Id.*  Nurse McFerran noted Plaintiff's cognition was

clear, she was not delusional or paranoid, and she had not cut herself since she was a teenager.

---

[2] The following recitation constitutes a summary of the evidence contained within the
Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket Nos. 15 and 16.

Nurse McFerran assessed PTSD, ADHD, and probable bipolar disorder, and prescribed Adderall. By April 15, 2008, Plaintiff reported she was calmer, able to do chores, and less irritable on Adderall. Nurse McFerran increased the Adderall. Tr. 782. On May 27, 2008, Plaintiff reported "doing much better," and Nurse McFerran added seroquel for insomnia and lamictal. Tr. 781.

On June 10, 2008, Plaintiff reported she had taken lamictal and had severe pain, tremors, anxiety, and desperation. Nurse McFerran noted "[s]he is angry and hinting at suicide if she doesn't begin to feel better soon." Tr. 780. Plaintiff was told to stop taking lamictal. Nurse McFerran assessed attention deficit disorder without hyperactivity, noting "[r]emarkable response I am concerned that there is another cause, rather than lamictal." *Id.*

On June 11, 2008, Plaintiff was seen in the emergency room for right foot pain. Tr. 526-27. She did not know how she hurt her foot. An xray showed no fracture though there was a cyst in the distal fibular head. Plaintiff was given 12 Percocet.

On June 16, 2008, Plaintiff was seen in the emergency room for right ankle and foot pain. Plaintiff said she injured the ankle while sleepwalking six days prior. Tr. 511. There was some tenderness and swelling, and Plaintiff was prescribed Percocet for right ankle sprain. Tr. 512. Two days later Plaintiff returned to the emergency room, was placed in an ankle sprint, and referred to her doctor, Richard Bolt, M.D. Tr. 779. Dr. Bolt saw slight swelling of the toes and "small areas of bruising" on the foot, Plaintiff was "extremely tender to light touch laterally on the foot and ankle and diffusely about the foot and ankle," and "seems to be in significant pain. *Id.* Dr. Bolt referred her to an orthopedist and prescribed 20 Percocet. A June 23, 2008, xray showed a lesion in the distal right fibula. Tr. 487.

On July 8, 2008, Nurse McFerran noted Plaintiff was "calmer," and was waiting for surgery to remove a cyst in her ankle. Tr. 778. He stated Adderall "is still working, but fading out at different times of the day." *Id.*

On August 11, 2008, Plaintiff had an open reduction internal fixation right fibula bone tumor removed with bone graft. Tr. 426. By August 22 her pain was decreasing and she was to discontinue Oxycontin and start Percocet. Tr. 414.

On September 11, 2008, James R. Verheyden, M.D., examined Plaintiff for left thumb pain. Tr. 957-58. She had pinched her thumb in her wheelchair a couple of days prior, and the pain was "exquisite" with sharp burning and throbbing. Tr. 957. Dr. Verheyden noted Plaintiff was "quite frustrated and angry" and continuously tapped the ground with her left foot. *Id.* Plaintiff was missing a small piece of skin from her thumb, about 2 x 3 millimeters in size, with superficial skin loss, scabbed over with no drainage or sign of infection. Dr. Verheyden stated Plaintiff's nerves appeared to be significantly flared up, she was "very angry" and "appears quite anxious and distressed." Tr. 958. He recommended massaging the area to desensitize the nerves, and Plaintiff "is adamant that she is not going to touch her finger, as she is still in pain from her right ankle surgery....The patient refuses to touch her finger and states she cannot believe how she is being treated." *Id.*

At a September 16 surgical follow up Plaintiff reported some ache but the pain was tolerable and she was not taking pain medication. Tr. 412. On September 22 Plaintiff was seen in the emergency room for pain behind the right knee persisting for six days. Tr. 638. At a physical therapy appointment on September 29 Plaintiff had significant muscle wasting of her right calf. Tr. 406.

Plaintiff was seen in the emergency room on October 13, 2008, for hip and back pain radiating into her neck after she "blacked out and fell into [the] metal border o f [her] bed" four days prior. Tr. 627. She refused to give a urine sample, and "was focused on pain meds in spite of having [symptoms]" four days." Tr. 628. Xrays of the lumbar spine, pelvis, and hand were normal. Tr. 631-37. At an October 22 surgical follow up, Michael C. Dennis, P.A.-C., noted mild swelling and pain "somewhat out of proportion to the exam." Tr. 409. She had a full range of motion and was advised to work on weight bearing to ease her symptoms. Physician's Assistant Dennis noted she might require a referral to pain management. Tramadol was prescribed.

On October 31, 2008, Plaintiff was seen in the emergency room for pelvic pain, refused pelvic examination, and was prescribed Darvocet. Tr. 619-20. On November 29, Plaintiff was seen in the emergency room for two days of acute ankle pain. Tr. 610. There was a little bit of swelling, she was to be nonweightbearing and prescribed Percocet. Xray of the ankle showed diffuse osteopenia. Tr. 615.

On December 8, 2008, Robert Hakala, M.D., assessed Plaintiff's ankle pain and ordered an orthopedic consultation. Tr. 776-77. On December 11 James Ritzenthaler, M.D., prescribed Atenolol for hypertension and suspected hyperthyroidism. Tr. 775. On January 7, 2009, Dr. Hakala's staff called Plaintiff offering to schedule the orthopedic appointment and was told "I really haven't been having the pain, so I don't need to see anyone right now." Tr. 774.

On January 8, 2009 Ralph Litchfield, M.D., saw Plaintiff to follow up on her hypertension. Plaintiff reported sharp pains in the chest radiating to her back and left arm. Tr. 772. Dr. Litchfield diagnosed Costochondritis and calcifying tendonitis of the shoulder. On

January 12, 2009, Plaintiff was seen in the emergency room for chest pain, and on January 15,

Dr. Hakala prescribed 20 Darvocet for chest wall pain. Tr. 771. On February 27, Plaintiff

returned to the emergency room with head and sinus pain. Tr. 753. A CT of her sinuses was

normal. Tr. 754. On March 17 Plaintiff was seen in the emergency room for wrist pain after she

hit her wrist on her bedside table while sleeping, and was prescribed Percocet. Tr. 724. Wrist

xrays were normal. 726. On March 18 Plaintiff returned to the emergency room for wrist pain

and was prescribed Percocet. Tr. 700.

On April 24, 2009, Plaintiff was seen in the emergency room for headache lasting seven

days. Tr. 602. CT scan of the brain was essentially normal. Tr. 603. Twenty four Percocet

were prescribed.

On May 1, 2009, Plaintiff was seen in the emergency room for head injury after fainting.

Tr. 579. The doctor noted moderate tenderness and muscle spasm in the paraspinous

musculature, and stated the "patient had been advised previously here that she has been getting a

number of prescriptions for narcotic pain medications of late, and was told that she needed

referral to a neurologist before further narcotic prescriptions would be generated from our

department." Tr. 579. Plaintiff left the emergency department before the physician could

reexamine her after treatment with Benadryl and droperidol for headache and pain.

Plaintiff returned to the emergency room on May 4 for neck pain and was given a

Lidoderm patch, Robaxin, and Medrol. Tr. 762. On May 18, 2009, Plaintiff filed the

application at issue here, alleging the onset of disability as of that date.

On May 21 Plaintiff was seen in the emergency room for an episode of syncope and

received eight Percocet. Tr. 729-30. An xray of the left tibia was normal, and a CT scan of the

Page 10 - OPINION AND ORDER

brain showed subtle left frontal deep white matter, possibly related to previous injury. Tr. 746.

On June 9, 2009, Nurse McFerran diagnosed PTSD, bipolar disorder, ADHD and personality

disorder not otherwise specified. Tr. 769. He noted Plaintiff had been sober six months, and

prescribed Depakote. On June 22 Plaintiff was seen in the emergency room for an ovarian cyst

and was prescribed 12 Percocet. Tr. 708.

Dr. Whitehead conducted a Comprehensive Psychodiagnostic Examination on August 5,

2009. Tr. 791-95. She specifically assessed Plaintiff for bipolar disorder, anxiety, ADHD, and

memory problems. Tr. 791. Dr. Whitehead reviewed records including function reports

completed by Plaintiff and her mother, Kim Henderson, in June 2009; a Disability Report Form

SSA-3368; Volunteers in Medicine Clinic of the Cascades medical progress notes dated June 9,

2009, June 26, 2009, June 10, 2008, and April 1, 2008; and St. Charles emergency room notes

dated June 22, 2009, May 1, 2009, and May 21, 2009.

Plaintiff reported problems with focus and memory, and found being around other people

difficult. She said she is not easy to get along with, has engaged in confrontation with bosses, is

angry most of the time, and prefers to stay home. She sometimes isolates in her room. Plaintiff

felt these symptoms and behaviors were getting worse. Tr. 791. She reported she was diagnosed

with bipolar disorder at age 13. Her father kicked her out, and she no longer had contact with

him.

Plaintiff reported a diagnosis of ADHD since childhood, as well as chronic headaches

stemming from a brain injury, pain, and excessive fatigue. She started abusing drugs and alcohol

in high school, cut herself, and attempted suicide. She lives with her boyfriend and three of his

children. Tr. 792. Plaintiff has had mental health services off and on since she was 13. She

Page 11 - OPINION AND ORDER

abused methamphetamine and cocaine heavily for about two years, and denied using those drugs

for fourteen years. She stopped drinking alcohol in about February 2009. Tr. 794.

Plaintiff reported headaches and PTSD arising out of physical assault when she was 15.

She received another head injury at age 16 when hit by a car. She has fibromyalgia and arthritis.

A cyst was removed from her right ankle in August 2008. *Id.* Plaintiff reported she was taking

Adderall, promethazine for nausea, and Depakote twice a day for bipolar disorder.

Dr. Whitehead noted Plaintiff "demonstrates outward pain behavior. She has normal gait

and station with adequate eye contact." Tr. 794. Dr. Whitehead stated Plaintiff cuts on her arms,

and admitted overdosing multiple times. Intellectual and cognitive abilities were estimated to be

in the low average to borderline range. Tr. 793. Personal grooming was inconsistent, but

concentration, persistence and pace were adequate.

Dr. Whitehead diagnosed chronic pain due to general medical and psychological factors;

ADHD, per claimant's history; bipolar 1 disorder per claimant's history, provisional; major

depression, recurrent; R/O opiate abuse; R/O dependent personality disorder; R/O borderline

personality disorder. *Id.* She assessed a GAF of 42-45.

Dr. Whitehead concluded:

> Based upon a review of recent ER visits, it is possible that [Plaintiff]
> has been opiate drug seeking with complaints of headaches that were
> likely stress-headaches in origin. She complains of being in constant
> pain and believes that she has rheumatoid arthritis and Fibromyalgia.
> Given the possible somatic overlay to the claimant's medical com-
> plaints it is strongly recommended that [Plaintiff] have an independent
> medical examination to further assess whether her reported health
> issues are consistent with actual physical ailments. [Plaintiff's]
> symptoms leading to bipolar disorder are vague. She appears to
> be primarily depressed, lacks motivation and possible seeking
> secondary gain to not being involved in ADLS's. Adderall seems

to be helping [Plaintiff] with focus, but she continues to complain
[of] lethargy and excessive fatigue.

Tr. 795.

Relying on the assessment of reviewing physician Paul Rethinger, Ph.D., Tr. 796-810, the

Administration found Henderson not disabled by Affective/Mood Disorders and Migraine. On

August 20, 2009, the Administration advised Henderson that she was not disabled for purposes

of the Act. Tr. 87.

On August 18 Plaintiff reported to Nurse McFerran that depakote caused stomach pain

and did not improve her mood. Tr. 896. She stated she had spent the past month more in than

out of bed, and was irritable when up. Nurse McFerran prescribed Adderall and lithium.

On August 20 Plaintiff told Cora Calomeni, M.D., that she had headaches with nausea

and spots in front of her eyes. Tr. 894. Dr. Calomeni referred her to a neurologist.

On September 3 Plaintiff was seen in the emergency room for headache with nausea. Tr.

857. The doctor's impression was this was a medication reaction, and she stopped the lithium

and prescribed 15 Percocet. On September 10 Plaintiff was seen in the emergency room for

abdominal pain and vomiting and was prescribed Percocet. Tr. 859. On September 15 Plaintiff

was seen by Robert Collins, M.D., for chronic headache and was prescribed Axert. Tr. 892. On

September 22 Plaintiff was seen by Richard Woods, M.D., for headache and was prescribed 30

Darvocet. Tr. 891. On September 26 Plaintiff was seen in the emergency room for headache and

was prescribed 20 Percocet. Tr. 860.

On October 13, 2009, Robert Collins, M.D., prescribed Medrol for chronic headache. Tr.

888.

Page 13 - OPINION AND ORDER

On October 15, 2009, Henderson requested reconsideration of the Administration's finding of non-disability. Tr. 101.

On October 28 Dr. Hakala saw Plaintiff for knee pain, noting Plaintiff was able to flex to only 90 degrees. Tr. 887. He ordered an orthopedic consultation and recommended Plaintiff continue to wear a knee brace.

On November 2 Allan MacKenzie, M.D., saw Plaintiff for severe right knee pain which Plaintiff reported began October 15 while she was cleaning her stove. Tr. 884. Dr. MacKenzie ordered an MRI and prescribed tramadol. The MRI showed a 4.5 centimeter lipoma (benign cluster of fat cells) in the tibia and was otherwise unremarkable. Tr. 899.

On November 13, 2009, Clarence Carnahan, M.D., saw Plaintiff for knee pain, noting her unstable mood. Tr. 882. He prescribed Clonazepam. On November 16 Dr. MacKenzie noted Plaintiff's leg pain bothered her day and night. Tr. 880. He described reduced circumference of the right patella, decreased sensation to light touch and prick, and referred Plaintiff to an orthopedist for evaluation of surgical removal of the lipoma.

On December 4, 2009, on reconsideration of Henderson's medical records, Administration consulting physician Sharon B. Eder, M.D., agreed with the mental limitations assessed by Dr. Boyd. Tr. 903-10. The Administration notified Henderson of its decision on reconsideration on December 16, 2009. Tr. 89-90.

On February 17, 2010, Timothy S. Bottom, M.D., examined Plaintiff for lower right leg pain. Tr. 990-91. Dr. Bottom found full range of motion of the knee, and "[p]ain is out of proportion to exam with respect to pain with just light touch of the skin over the proximal tibia."

Tr 991. On that date, Henderson requested a hearing before an Administrative Law Judge. Tr. 109-110.

On May 26, 2010, Plaintiff was seen in the emergency room for headache lasting three days with vomiting. Tr. 915-27. The doctor noted normal extremities with adequate strength and full range of motion, and prescribed 26 Percocet. Tr. 920.

On January 10, 2012, a hearing was conducted before an ALJ in connection with Henderson's applications. Tr. 41-84. Henderson, her counsel, and a vocational expert were present. Tr. 41. At the hearing, Henderson amended her alleged onset date of disability to May 18, 2009, and withdrew her Title II application for disability insurance benefits. Henderson testified in relevant part that she spends "most of my day, the majority of my day in bed in my pajamas doing absolutely nothing. Because of my stomach I'm in the bathroom a lot. I'm in pain a lot." Tr. 58. The pain is in her stomach and right leg. She has no hobbies and does not read. "Besides going to doctor's appointments or mental health, I'm in bed." Tr. 59. She watches television and listens to headphones "a lot to try to block out things that are going on in my head." Id. Henderson started seeing a therapist a week before the hearing, at Deschutes County Mental Health (DCMH). She has been seen at DCMH intermittently since she was 13 when she started medication for bipolar disorder. Tr. 60-62. Plaintiff testified that she was on nine medications, and they affect her ability to concentrate and understand questions. Tr. 64. The medications make her feel numb and slow, and her memory is poor. She becomes emotional and cries easily. This has been true since May 2009.

Henderson testified she has eczema exacerbated by stress. Tr. 65. She has chronic regional pain syndrome (CRPS) in the right leg for which she takes pain medication and received

spinal injections. Tr. 66. The pain in her leg is on her mind when she is sitting, and she tries to do as little as possible. Tr. 67.

Her bipolar disorder is "now more severe than it has ever been in my life. It's like I'm fighting to live. I have suicidal thoughts a lot. I don't act upon them, but I think having them is just as bad." *Id.* Henderson stated that she hates waking up in the morning because she doesn't know "what person's going to pop out." *Ibid* Her moods cycle minute by minute. "I don't know from one minute to the next on if I'm going to break out and cry, or have bad thoughts, or get angry, or get violent towards myself or others and it scares me." Tr. 68. Her condition makes it difficult for her to go out in public. She has anxiety. The severity of her condition has been the same since May 2009. She has had the leg problem for about three years. In the past three months she developed stomach pain and requires ready access to a bathroom.

Henderson's medications at the hearing were Clonazepam twice a day, Zanaflex every six hours as needed, Seroquel, Fioricet twice a day, Loperamide four times a day, Zoloft, Promethazine, and Propranolol three times a day

Henderson testified that she had had anxiety for years, and breaks out in sweats, her heart races, she becomes nauseous, so she tries not to do anything. Tr. 73.

The VE testified that jobs existed, despite Henderson's limitations as expressed in the ALJ's RFC, including candy maker helper, laundry worker, and hand packager. Tr. 77-78.

On January 21, 2012, Henderson's mother, Kimberly G. Henderson, wrote a letter, stating she had hired her daughter twice to work for her as a housekeeper. Tr. 259. The first time Henderson had to quit or be fired because of severe mood changes and the inability to get out of bed sometimes. She hired her again a year later and "she really did try hard" but could not focus

on her job duties and was angry with guests and co-workers and was fired. Ms. Henderson stated

her daughter had severe mood swings since she was a preteen, with cutting and suicide attempts.

Tr. 260.

On February 13, 2012, the ALJ denied Henderson's application. Tr. 24-34. Henderson

timely requested review of the ALJ's decision, Tr. 18-20, and the Appeals Council denied her

request on May 16, 2013. Tr. 11-14. In consequence, the ALJ's decision of February 13, 2012,

became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. §

422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law

Judge found that Henderson did not engage in substantial gainful activity at any time following

her claimed disability onset date of May 18, 2009. Tr. 27. He therefore proceeded to the

second step of the analysis.

At the second step, the ALJ found that Henderson's medical impairments of "tension

headaches, status post open reduction/internal fixation of a right ankle fracture; a history of

attention deficit/hyperactivity disorder; bipolar disorder; pain disorder; and personality disorder

with dependant and borderline traits" were "severe" for purposes of the Act. *Id.* Because the

impairments were deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Henderson's impairments was the equivalent

of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 28. The ALJ

therefore properly conducted an assessment of Henderson's residual functional capacity.

Specifically, the ALJ found Henderson had the capacity to perform a range of medium work: she

Page 17 - OPINION AND ORDER

can stand/walk six hours in a day and sit six hours in a day. "Her ability to push/pull is limited

only by the applicable weight restriction of medium work. She is limited to infrequent climbing

of ramps or stairs, and no more than occasional kneeling, crouching, crawling, or climbing of

ladders, ropes, or scaffolds. She must avoid exposure to workplace hazards, such as unprotected

heights and moving machinery. She can understand, remember, and complete simple, unrushed

tasks with set, predictable routines. She must avoid tasks involving close interaction with the

public." Tr. 30.

At the fourth step of the five-step process, the ALJ found that Henderson had no past

relevant work. Tr. 33. At step five, the ALJ relied on the testimony of a Vocational Expert (VE)

and determined there were jobs in the national economy that Henderson can perform, including

candy maker helper, laundry helper, and hand packager. Tr. 34. On that basis, the ALJ

concluded that Henderson was not disabled as defined in the Act at any time between March 18,

2009, and February 13, 2012. *Id.*

## ANALYSIS

Henderson challenges the Commissioner's assessment of her residual functional capacity.

Specifically, Henderson argues that the Administrative Law Judge improperly weighed the

medical evidence, improperly failed to credit Henderson's own testimony regarding the severity

of her symptoms, and improperly rejected the lay testimony.

## I. Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F3d 1035, 1039 (9th Cir 1995).

However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,*

157 F3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant

is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear

and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence

undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be

substantial. *Reddick*, 157 F3d at 724. *See also Holohan v. Massinari*, 246 F3d 1195, 1208 (9th

Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient

basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan*, 246

F3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific

to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.

*Thomas v. Barnhart*, 278 F3d 947, 958 (9th Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must

perform two stages of analysis:  the *Cotton* analysis and an analysis of the credibility of the

claimant's testimony regarding the severity of her symptoms." [Footnote omitted.] *Smolen v.

Chater*, 80 F3d 1273, 1281 (9th Cir 1996).

> Under the *Cotton* test, a claimant who alleges disability based on subjective
> symptoms "must produce objective medical evidence of an underlying
> impairment which could reasonably be expected to produce the pain or other
> symptoms alleged...." *Bunnell*, 947 F.2d at 344 (quoting 42 U.S.C. § 423
> (d)(5)(A) (1988)); *Cotton*, 799 F.2d at 1407-08. The *Cotton* test imposes
> only two requirements on the claimant:  (l)  she must produce objective
> medical evidence of an impairment or impairments; and (2)  she must
> show that the impairment or combination of impairments  *could
> reasonably be expected to* (not that it did in fact) produce some degree
> of symptom.

*Smolen*, 80 F3d at 1282.

Plaintiff argues the ALJ improperly rejected her pain and subjective symptom testimony. The ALJ noted Plaintiff's testimony of chronic right leg pain and bipolar symptoms and found her not fully credible to the extent that her symptom testimony is inconsistent with the residual functional capacity assessment. Tr. 31. The ALJ noted that despite her complaints of leg pain the "medical records repeatedly indicate she has been able to walk with normal gait and demonstrate normal motor strength." Tr. 31, 794, 974, 976. A physician treating Plaintiff for leg pain noted a steady and nonantalgic gait and normal coordination without ataxia or dysmetria. Tr. 974. Plaintiff's extremities did not exhibit any clubbing, cyanosis, or edema, and her right knee and ankle demonstrated normal range of motion. *Id.* An examining psychologist reported Plaintiff had "normal gait and station." Tr. 31, 794. The ALJ reasonably rejected Plaintiff's allegations given their inconsistency with the medical evidence.

The ALJ found Plaintiff not fully credible as to other symptoms as inconsistent with the medical evidence. Tr. 32. The ALJ noted Plaintiff's complaints of debilitating headaches, lethargy, and excessive fatigue, were contradicted by mental status examination revealing logical and coherent thought content, goal directed mental activity, and adequate concentration, persistence, and pace. *Id.*; Tr. 794, 793. The ALJ noted Plaintiff's contention that she can pay attention for "seconds," and is unable to follow written or spoken instructions was contradicted by tests showing she was oriented in all spheres, able to recall three of three items, and name the current and previous U.S. Presidents. Tr. 29, 159, 793.

The ALJ found Plaintiff less than fully credible because there was evidence of drug seeking behavior. Tr. 31. As set out above the medical evidence suggests drug seeking behavior, and the ALJ reasonably relied on that evidence to find Plaintiff less than fully credible.

The ALJ noted Plaintiff's credibility regarding debilitating pain was undermined by the evidence that she "was not even using the pain medications prescribed to her." Tr. 31. On November 7, 2011, treating Physician's Assistant Billie Cartwright, P.A.-C., reported a high sensitivity drug screen used to confirm Plaintiff's use of "very high doses" of narcotic pain medication was "negative for any evidence of narcotics." Tr. 1093. Ms. Cartwright wrote that if Plaintiff "were taking her medication as prescribed or even if she had been taking it in the last week, it would have been positive." *Id.* On November 10, 2011, Ms. Cartwright wrote "If [patient] calls requesting narcotics please inform her that we will not be giving this [patient] any more narcotics due to the drug screen results. We ran a high sensitivity screen. This would not be a false negative if she had taken her medications as prescribed." The ALJ's credibility determination is supported by substantial evidence. *Id.*

## II.    Medical Opinions

An ALJ may properly reject a treating physician's uncontradicted medical opinion only for "clear and convincing reasons." *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995). When the treating physician's opinion has been contradicted, however, it may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). This can be done by setting out a detailed and thorough summary of the facts, providing an appropriate interpretation thereof, and making findings. *See Megallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Plaintiff argues that the ALJ erred by giving "less weight" to Dr. Whitehead's assessment of a GAF score of 42-45 "since it appears to be based largely on the Plaintiff's reported history-

Page 21 - OPINION AND ORDER

which is only partially credible." Tr. 32.   An ALJ may reject "a treating physician's opinion if it

is based to a large extent on a claimant's self-reports that have been properly discounted as

incredible." *Tommasetti,* 533 F.3d at 1041.   Moreover, the GAF scale is not determinative of

mental disability for Social Security claim purposes because it does not have a direct correlation

to the severity requirements in the mental disorder listings.  *See* 65 Fed. Reg. 50, 746-50, 764-65

(Aug. 21, 2000).  The GAF scale's lack of probative value in determining disability is

demonstrated by the fact that it is no longer included in the diagnostic and statistical manual "for

several reasons, including its conceptual lack of clarity...and questionable psychometrics in

routine practice."  American Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL

OF MENTAL DISORDERS 16 (5th ed. 2013).

  The ALJ found Dr. Whitehead's opinion justified non-exertional limitations based on low

average to borderline cognitive abilities and possible somatic overlay.  Noting Plaintiff was able

to fully recall all three words during memory testing, and was able to correctly perform a

mathematical calculation, the ALJ concluded that Dr. Whitehead's opinion did not establish that

Plaintiff's mental status precludes all work-related mental activities.  Tr. 32.

  The ALJ identified clear and convincing or specific and legitimate reasons supported by

substantial evidence to give Dr. Whitehead's opinion little weight.

  Plaintiff contends the ALJ erred by failing to fully consider the records of mental health

treatment in 2010 and 2011.  Those records are counseling and mental health treatment notes that

primarily recount Plaintiff's subjective complaints.  None of the clinicians in the record opined

Plaintiff was more functionally restricted than the ALJ's residual functional capacity assessment.

Page 22 - OPINION AND ORDER

None of the records contain an opinion indicating Plaintiff had any specific work related functional limitation.

Plaintiff argues the ALJ erred by failing to note two GAF scores. On October 18, 2010, Taylor McClure, a mental health counselor, opined Plaintiff had a GAF score of 50. Tr. 1054. On April 18, 2011, therapist Tess Migdol completed a treatment summary form in which she assessed Plaintiff's GAF score as 50. Tr. 1009. As previously noted, GAF scores are not necessarily probative evidence.

Plaintiff contends the ALJ failed adequately to consider her regional complex pain syndrome. However, the ALJ noted the diagnosis and found it "reasonably justifies an exertional limitation to a range of medium work." Tr. 31. The ALJ accommodated the pain syndrome by limiting Plaintiff to six hours of standing or walking, with additional limitations in climbing, kneeling, crawling, crouching, and exposure to workplace hazards. Tr. 29-30.

Plaintiff contends the ALJ failed adequately to consider her abdominal pain, vomiting, and diarreha. The ALJ noted the symptoms, and that the December 2011 colonoscopy "failed to reveal the etiology of her pain symptoms," and that stool studies and imaging studies were negative. Tr. 27, 1219, 1221. The ALJ also noted that Plaintiff's abdominal symptoms did not satisfy the durational requirement to be considered "severe." Tr. 28; *see* 20 C.F.R. § 416.909.

On this record, the ALJ's weighing of the medical opinions was supported by substantial evidence.

/ / /

/ / /

/ / /

Page 23 - OPINION AND ORDER

### III. Lay Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d);

404.1545(a)(3); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members

in a position to observe the claimant's symptoms and daily activities are competent to testify

regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). The

ALJ may not reject such testimony without comment and must give reasons germane to the

witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236

F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant

properly found not credible. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

On June 8, 2009, Plaintiff's mother Kimberly Henderson completed an Adult Function

Report. Tr. 162-69. Ms. Henderson wrote that she saw her daughter one to two times a week to

go to garage sales and thrift stores or watch movies. Tr. 162. Ms. Henderson said Plaintiff lays

in bed most of the time and naps a lot, and that she needs reminders to take her medication, wash

her hair, and change her clothes. Tr. 164. Ms. Henderson wrote that Plaintiff does not cook, and

that folding and putting away a load of laundry can take two to three days. Plaintiff might start a

chore but does not complete it. Tr. 165. She tries to go outside at least once a day. Plaintiff

does not drive, and shops once a month with her mother or boyfriend. She does not pay bills or

use a checkbook, and cannot handle money. Plaintiff needs to be reminded to attend

appointments, and has no friends. Tr. 166-67. Ms. Henderson stated Plaintiff's conditions affect

lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing,

seeing, memory, completing tasks, concentration, understanding, following instructions, using

hands, and getting along with others. Tr. 167. Plaintiff can walk one block before requiring rest, and can pay attention for five minutes. *Id.* She does not get along with authority figures, and has been laid off for failure to get along with others. Ms. Henderson said her daughter does not handle stress or changes in routine well. Tr. 168.

On January 21, 2012, Ms. Henderson wrote a letter to whom it may concern in which she stated that she had hired her daughter twice to work for her as a housekeeper. Tr. 259-60. Plaintiff had severe mood changes and "couldn't get out of bed to come to work," and was laid off. A year later she re-hired Plaintiff but she could not focus on her job duties, was forgetful, and had mood swings, and was fired. Ms. Henderson stated Plaintiff could not safely be left alone. Tr. 260.

The ALJ noted Ms. Henderson's reports, and found they were inconsistent with Plaintiff's reported daily activities of going outside daily, writing poetry, and watching television. Tr. 32. The ALJ noted Plaintiff managed her personal care independently, prepared simple meals, and was engaged in a long term relationship with her boyfriend. Tr. 28. The ALJ further noted Ms. Henderson's statements were inconsistent with the absence of objective clinical medical findings supporting Plaintiff's complaints. Tr. 32-33.

///

///

///

///

///

///

Page 25 - OPINION AND ORDER

The ALJ's assessment of the lay testimony is supported by substantial evidence.

## CONCLUSION

The Commissioner's decision is supported by substantial evidence. For these reasons, the decision of the Commissioner is affirmed and this matter is dismissed.

Dated this 7th day of April, 2015.

Honorable Paul Papak
United States Magistrate Judge